UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

────────────────────────────────

CYNTHIA M. PALMER,

                    Plaintiff,

          -vs-                          **No. 1:15-CV-00402 (MAT)**
                                        **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

────────────────────────────────

**I.   Introduction**

     Represented by counsel, Cythia M. Palmer ("plaintiff") brings
this action pursuant to Title II of the Social Security Act ("the
Act"), seeking review of the final decision of the Commissioner of
Social Security ("the Commissioner") denying her application for
disability insurance benefits ("DIB"). The Court has jurisdiction
over this matter pursuant to 42 U.S.C. § 405(g). Presently before
the Court are the parties' cross-motions for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.  For the reasons discussed below, plaintiff's motion is
granted to the extent that this matter is remanded to the
Commissioner for further administrative proceedings consistent with
this Decision and Order.

**II.  Procedural History**

     The record reveals that in October 2011, plaintiff (d/o/b
December 15, 1969) applied for DIB, alleging disability beginning
August 11, 2011. After her application was denied, plaintiff
requested a hearing, which was held, via videoconference, before

administrative law judge Curtis Axelson ("the ALJ") on August 22, 2013 and November 7, 2013.[1] The ALJ issued an unfavorable decision on December 30, 2013. The Appeals Council denied review of that decision and this timely action followed.

## III. Summary of the Evidence

On February 23, 2008, ALJ Robert T. Harvey found that plaintiff was disabled as of July 1, 2005 due to her impairment of schizophrenia, which he found met Listing 12.03. See 20 C.F.R., Part 404, Subpart P, App'x 1, § 12.03. Plaintiff's disability insurance benefits ceased on or about August 11, 2011 (her alleged onset date in the instant proceeding).[2] Instead of asking that her first case be reopened, plaintiff instead filed a new application. The administrative record in the instant case does not contain plaintiff's medical history from her prior claim; the medical record in the instant case begins in approximately November 2011.

On November 5, 2011, plaintiff was hospitalized at Niagara Falls Medical Center ("NFMC") for psychiatric symptoms including anxiety and depression. Her admitting diagnosis was psychotic

---

[1] Plaintiff's brief points out that both the first hearing and the later supplemental hearing lasted approximately 12 minutes each.

[2] Plaintiff's prior administrative record was not included in the administrative record before the ALJ in the instant case. At plaintiff's August 22, 2013 hearing, the ALJ noted that plaintiff's benefits were ceased because plaintiff's "health [had] improved . . . and [she was] now able to work." T. 33-34. Plaintiff's attorney noted that plaintiff had worked temporarily, and earned income sufficient to constitute substantial gainful activity ("SGA").

disorder, not otherwise specified ("NOS"), with a note to rule out chronic schizophrenia, undifferentiated. Plaintiff remained hospitalized from November 5 through 14, 2011. Upon admission, she reported that she was recently notified that her disability benefits would cease, and complained of symptoms of hopelessness, helplessness, and depression "with increasing symptoms of psychosis," including auditory and visual hallucinations. T. 273-74. She was prescribed Seroquel (an antipsychotic used in the treatment of schizophrenia, bipolar disorder, and depression) for her smyptoms. Upon discharge, plaintiff was "much improved, stable, and not a danger to herself or other people." T. 274.

Plaintiff returned to NFMC on November 17, 2011, at which point she was admitted again and not discharged until November 30, 2011. Upon admission, plaintiff complained of suicidal ideation, reporting that "after she left [the hospital] on 11/14/2011, she found out she did not have a job on 11/15/2011." T. 268. Plaintiff reported this situation to a "job coach." Id. Plaintiff stated that while she was on disability she had been working part-time, but since her benefits had ceased she was forced to work a full-time job, which she reported was "too much for her." Id. Her global assessment of functioning ("GAF") upon admission was 40-45. See generally American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000) (describing global assessment of functioning ("GAF")

scoring). A GAF score of between 31 and 30 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. Id. A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). Id.

Plaintiff was diagnosed with psychotic disorder NOS, depression with suicidal ideation, chronic schizophrenia undifferentiated, and mild mental retardation. Upon discharge approximately two weeks after she was admitted, plaintiff was assessed with a GAF score of 55, indicating moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plaintiff was again hospitalized from December 9, 2011 through December 20, 2011. Upon admission, plaintiff reported suicidal ideation and was assessed with a GAF score of 40. Dr. Kalaiselvi Rajendran, who had treated plaintiff on her prior visits to NFMC, noted that "[i]n spite of [plaintiff's] extensive support, she came to the hospital." T. 259. He diagnosed plaintiff with psychotic

4

disorder, NOS; adjustment disorder "with mixed emotion"; mild mental retardation; and personality disorder NOS. During her hospitalization, Dr. Rajendran treated plaintiff with a variety of prescription medications, including Seroquel, Paxil (an antidepressant), Klonopin (a sedative), and Depakote (an anticonvulsant used in treatment of seizures and bipolar disorder). Upon discharge, plaintiff was continued on all of these medications and was assessed with a GAF score of 55.

The record indicates that plaintiff was referred to Niagara County Mental Health ("NCMH") in early 2012, but she cancelled multiple appointments. On February 6, 2012, Matthew Davis, LCSW conducted a mental status examination ("MSE") of plaintiff and found that she had flat affect and anxious mood; speech was hesitant; recent memory was mildly impaired; psychomotor activity was "characterized by fidgetiness"; thoughts were preoccupied with her disability application; and she had poor impulse control. LCSW Davis assigned a GAF score of 60, indicating moderate symptoms. On March 6, 2012, LMSW Marie Roth conducted an MSE and found that plaintiff's mental status was essentially unchanged from her February 6 visit. Plaintiff reported that she continued to take Paxil, Depakote, Seroquel, and Klonopin for psychiatric symptoms, with monitoring from her primary care physician, Dr. John Sauret. On March 19, 2012 LMSW Roth noted that plaintiff reported visual hallucinations in the form of "people watching her" and at times

auditory hallucinations in the from of "hearing sounds in the walls - pounding." T. 341. LMSW Roth noted that plaintiff also suffered from anxiety, confused thinking, and flat and inappropriate affect. LMSW opined that plaintiff suffered from weaknesses including difficulty following directions, learning new concepts, making connections between ideas; she lacked insight; she had limited coping skills, intellectual functioning, job skills, and social and interpersonal skills; she had a poor attention span and short-term memory; and she was too easily angered.

On March 1, 2012, psychologist Dr. Sandra Jensen completed a consulting psychiatric evaluation at the request of the state agency. Plaintiff was driven to the appointment by her case manager, and reported living in supportive housing through Community Missions. She reported attending a day treatment program "to get a higher level of care," and her case manager through Child and Family services "help[ed] her with day to day living and making appointments." T. 284. On MSE, plaintiff appeared "slightly disheveled"; speech was prosodic; thought processes were coherent and goal-directed; affect was flat and mood was neutral; and "intellectual functioning [was] probably in the below average range" with a "somewhat limited" general fund of information. Id.

Dr. Jensen opined that plaintiff was able to do "all activities of daily living without difficulty," but she could not manage her money. According to Dr. Jensen, plaintiff was able to

"follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a regular schedule, learn new simple tasks, and perform complex tasks with supervision within normal limits." T. 287. Dr. Jensen opined that plaintiff's "ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress will be mildly to markedly impaired depending upon the severity of her psychiatric issues and complexity of the task because of her psychiatric issues." Id. Dr. Jensen recommended that plaintiff "remain in her day treatment program and then have vocational training and rehabilitation to return to work." Id.

On April 20, 2016 plaintiff was evaluated by psychiatrist Curlane Jones-Brown. On MSE, plaintiff's thought content reflected that she "[felt] people [were] watching her." T. 336. She reported "crying a lot, hopeless[ness] at times, helpless[ness]," and stated that she "lived in housing for those for the mentally ill." Id. Plaintiff's judgment was poor/limited. Dr. Jones-Brown diagnosed plaintiff with schizoaffective disorder, depressive type, and anxiety disorder NOS. She was continued on her various psychiatric medications. Plaintiff saw Dr. Jones-Brown again on June 15, 2012. Dr. Jones-Brown noted similar symptoms, but recorded that plaintiff "appear[ed] more stable [and] denie[d] depression or anxiety."

Dr. Jones-Brown decreased plaintiff's dosages of Seroquel and Depakote. He assessed her with a current GAF of 60.

Plaintiff treated at Kaleida Health from approximately July through November 2012, with individual and group therapy. Dr. Michael Godzala, a psychiatrist, diagnosed plaintiff with schizoaffective disorder, rule out bipolar disorder, rule out depression with psychotic features, and cocaine dependence. Dr. Godzala noted, on MSE, that plaintiff's thoughts were "logical but simple/concrete with some circumstantiality," and plaintiff's insight was mildly impaired. During the course of plaintiff's treatment at Kaleida, Dr. Godzala noted GAF scores of 50-59, indicating moderate symptoms.

Plaintiff's treatment was transferred to Horizons Health Services in November 2012. Her initial GAF score was assessed at 42, indicating serious symptoms. On November 20, 2012, plaintiff was evaluated by Dr. Dham Gupta, who noted that plaintiff reported having been homeless for a period of time but that she currently lived with her ex-husband. Dr. Gupta diagnosed plaintiff with schizoaffective disorder, bipolar type. On February 8, 2013, plaintiff reported that she had moved back into a supportive housing situation. Plaintiff reported ceasing taking Seroquel because of grogginess. On April 6, 2012, nurse practitioner ("NP") Adrienne Roy noted, on MSE, that plaintiff's thought processes were tangential and she appeared hypomanic. NP Roy assessed a GAF score

of 40. Plaintiff was discharged from treatment at Horizons in August 2013, with a recommendation that plaintiff's services be "streamlin[ed] . . . since it [was] doubtful that [plaintiff] would make any further gains in treatment without outpatient 1:1 counseling." T. 579.

Meanwhile, in March 2013, plaintiff had been screened and admitted by Community Missions Niagara Visions PROS (Personalized Recovery Oriented Services) ("PROS"). Records from PROS indicate that plaintiff was diagnosed with schizoaffective disorder and cocaine dependence in brief remission (with a last use date of July 6, 2012). Plaintiff regularly engaged in individual and group therapy from March 2013 through at least September 2013. At PROS, plaintiff was variously diagnosed with schizoaffective disorder, psychotic disorder, personality disorder, and learning disorder. On August 29, 2013, plaintiff was assessed with a GAF score of 45. She was continued on psychiatric medications throughout this period.

**IV. ALJ's Decision**

Initially, the ALJ found that plaintiff met the insured status requirements of the Act through June 30, 2016. At step one of the five-step sequential evaluation, see 20 C.F.R. § 404.1520, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her alleged onset date, August 11, 2011. At step two, the ALJ found that plaintiff suffered from the following severe impairments: obesity, pulmonary disease by history, deep

9

vein thrombosis by history "and use of Coumadin," and schizophrenia "controlled by medication." T. 22. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment.

In assessing plaintiff's mental functioning, the ALJ concluded that she was mildly limited in activities of daily living, moderately limited in social functioning and in concentration, persistence or pace, and had no prior episodes of decompensation of repeated duration. In assessing the C criteria of the regulations, see 20 C.F.R., Part 404, Subpart P, App'x 1, the ALJ found that plaintiff was "able to adjust to increased mental demands and changes in her environment," she was "able to function outside a highly supportive living arrangement and [did] not require such an arrangement"; she "[had] not been hospitalized for any psychiatric impairment; and she "[did] not have a medically documented history of a chronic affective disorder of at least 2 years duration that [had] caused more than minimal limitations in ability to do basic work activities." T. 24.

Before proceeding to step four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) except that she was "limited to unskilled, routine work with two and three step tasks" and she could have only "occasional contact with the public

and supervisors." T. 24. At step four, the ALJ found that plaintiff was capable of performing past relevant work ("PRW") as a cleaner or housekeeper. Accordingly, the ALJ found that plaintiff was not disabled and did not proceed to step five.

## V. Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A.   Weight Given to Medical Opinions

Plaintiff contends that the ALJ's RFC assessment is unsupported by substantial evidence, arguing that the ALJ failed to properly weigh the medical opinions of record. Specifically, plaintiff argues that the ALJ failed to give adequate consideration to the various GAF scores assessed by treating sources, and failed to properly evaluate the opinion of consulting psychologist Dr. Jensen, whose opinion the ALJ purported to give "significant" weight. T. 28.

The administrative record does not contain a functional assessment from a treating physician. Plaintiff's argument,

11

however, centers on the ALJ's attention to GAF scores assigned by various treating physicians. The ALJ cited two GAF scores in his decision - a GAF score of 60 in February 2012 and a GAF score of 55 in August 2013. As can be seen from the discussion above, these two GAF scores were not representative of the gamut plaintiff's scores ran during the time period relevant to this claim. It does appear from the decision, then, that with regard to GAF scores, the ALJ impermissibly picked and chose scores that would support his conclusion that plaintiff's condition improved, while ignoring scores that would not support it. Significantly, the August 26, 2013 GAF score cited by the ALJ was assessed upon discharge from Horizons (where plaintiff had a GAF score of 40 upon admission), but only three days later, on August 29, 2013, plaintiff was assessed through Community Missions with a GAF score of 45.

"The Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the [regulations] that the ALJ considers [to determine whether the claimant has a per se disability]." Santiago v. Colvin, 12 CV 7052, 2014 WL 718424, *20 n.10 (S.D.N.Y. Feb. 25, 2014) (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (Aug. 21, 2000)); see also Beck v. Colvin, 2014 WL 1837611, at *10 (W.D.N.Y. May 8, 2014) ("[A] GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of

a claimant's ability to work.") (quotation omitted). Although, in this case, the ALJ's citation to only two GAF scores from the record indicates that his review of the record was less than thorough, no treating physician actually submitted an opinion regarding plaintiff's functional capacity.

The ALJ, however, purported to give "significant weight" to the consulting opinion of Dr. Jensen, who was the only medical professional to provide a thorough and formal evaluation of plaintiff's functional capacity after examination. Dr. Jensen found that plaintiff would be "mildly to markedly" limited in making appropriate decisions, relating adequately with others, and appropriately dealing with stress, due to her psychiatric symptoms. Dr. Jensen also recommended that plaintiff be continued in her current day treatment program with an eventual goal of vocational training and rehabilitation. The ALJ's RFC finding limited plaintiff to "unskilled, routine work with two and three step tasks," with only occasional contact with the public and supervisors. T. 24.

The Court agrees with plaintiff that the ALJ's RFC assessment did not adequately reflect those portions of Dr. Jensen's opinion that suggested she was limited, possibly to a marked extent, in the areas listed above. Rather, it is clear from the ALJ's decision that, as with his assessment of the GAF scores, his review of Dr. Jensen's opinion credited only those sections which would

support a finding of non-disability and ignored the portions which would suggest a higher level of limitation. Such selective bias in the interpretation of medical opinions is impermissible. See Showers v. Colvin, 2015 WL 1383819, *7 n.17 (N.D.N.Y. Mar. 25, 2015) ("While administrative law judges are entitled to resolve conflicts in the record, they cannot pick and choose only evidence that supports a particular conclusion.") (citing, inter alia, Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.")).

This case is therefore reversed and remanded for further consideration of Dr. Jensen's opinion. Because the ALJ gave this opinion significant weight, on remand the ALJ is instructed to fully account for Dr. Jensen's opinion when determining plaintiff's RFC. If the ALJ rejects any portion of Dr. Jensen's opinion an explanation should be provided so that a reviewing Court can glean the ALJ's rationale from the decision. If the ALJ deems it necessary, he should request clarification from Dr. Jensen as to her meaning in assigning "mild to marked" limitations to plaintiff in various areas of functioning. Also, in regard to evaluating stress, the ALJ is required to "make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work," and to integrate

those findings into the RFC finding. <u>Windom v. Colvin</u>, 2015 WL 8784608, *5 (W.D.N.Y. Dec. 15, 2015) (quoting <u>Stadler v. Barnhart</u>, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006)).

   **B.    Step Two Finding**

   Plaintiff also contends that the ALJ failed to properly assess, at step two, the effects of plaintiff's diagnoses of psychotic disorder, depressive disorder, anxiety disorder, adjustment disorder, and personality disorder. See Doc. 11-1 at 18-19. The Court agrees. The record indicates that plaintiff was variously diagnosed with several distinct mental health impairments. However, the ALJ's decision found that only plaintiff's schizophrenia was severe at step two, without considering whether plaintiff's various other mental health diagnoses, which included those listed above, were severe. That error was not harmless because the ALJ's decision and ultimate RFC finding do not clearly indicate that he considered the full measure of plaintiff's mental impairments when proceeding through the five-step sequential analysis. See, e.g., <u>Childs v. Colvin</u>, 2016 WL 1127801, *4 (W.D.N.Y. Mar. 23, 2016).

   Therefore, on remand, the ALJ is to consider each of plaintiff's mental health impairments and determine, at step two, whether each impairment is severe based upon the medical record evidence. The ALJ is then required to complete the balance of the sequential evaluation process with due consideration to all of

plaintiff's limitations, whether stemming from severe impairments or not. See, e.g., Paolella v. Colvin, 2014 WL 6769296, *13 (E.D.N.Y. Dec. 1, 2014) (citing Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)).

Even considering plaintiff's schizophrenia, at step three, the ALJ made inconsistent findings which do not comport with the medical record. In considering the paragraph C criteria, the ALJ found that plaintiff was "able to adjust to increased mental demands and changes in her environment," she was "able to function outside a highly supportive living arrangement and [did] not require such an arrangement"; she "[had] not been hospitalized for any psychiatric impairment; and she "[did] not have a medically documented history of a chronic affective disorder of at least 2 years duration that [had] caused more than minimal limitations in ability to do basic work activities." T. 24.

First, this passage of the ALJ's decision indicates that he consulted paragraph C of *Listing 12.04*, applicable to affective disorders, rather than *Listing 12.03* (the listing the ALJ stated he considered), which is applicable to schizophrenic, paranoid, and other psychotic disorders. Second, the ALJ's findings listed above are largely contradicted by the record. Although plaintiff has not argued that the ALJ erred at step three, the Court points to these findings because they indicate factual inaccuracies which cannot be reconciled with the record before the Court, and further

16

demonstrate that the ALJ did not fully consider plaintiff's mental health limitations in proceeding through the balance of the five-step disability analysis. On remand, the ALJ is directed to consider both Listings 12.03 and 12.04, as well as any other listings deemed relevant to plaintiff's impairments.

The Court notes that paragraph C of both Listings 12.03 and 12.04 requires either repeated episodes of decompensation of extended duration; a residual disease process resulting in marginal adjustment as defined by the regulation; or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement. Unfortunately, on this record the Court is unable to determine whether plaintiff's impairments met the requirements of paragraph C of either listing 12.03 or 12.04. There are indications from the record, however, that plaintiff may meet one or more of those requirements.[3] For example, although it is clear that plaintiff lived in a highly supporting living arrangement during the relevant time period, the duration of that arrangement is not clear from the record, nor is plaintiff's need for such

---

[3] In this regard, the ALJ is reminded that although the listing defines "repeated episodes of decompensation" as three episodes within one year or an average of one every four months (each lasting for at least two weeks), the listing also states that for claimants who experience more frequent episodes of shorter duration, the ALJ should determine if the duration and the functional effects are of equal severity. 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00.

17

arrangement. Findings regarding plaintiff's need for such an arrangement and the extent of plaintiff's adjustment are best made with reference to competent medical opinion. Thus, on remand, the ALJ is directed to obtain a competent medical opinion, preferably from a treating source, as to whether plaintiff met the requirements of either Listing 12.03 or 12.04 during the time period relevant to this claim.

### C.  Plaintiff's Remaining Arguments

Because the ALJ's decision reflected several significant factual errors as noted above, the Court expects that the ALJ's RFC assessment and/or findings regarding the listings will necessarily be altered when considered on remand. The Court thus declines to address plaintiff's further arguments regarding credibility and the ALJ's step four finding. On remand, the ALJ is directed to reconsider his findings in that regard, after full consideration of the complete administrative record in this case.

## VI.  Instructions on Remand

In summary, upon remand:

(1) The ALJ is directed to fully consider Dr. Jensen's consulting opinion and, if the ALJ elects to reject a portion or portions of that opinion, he must make his rationale clear;

(2) If the ALJ deems it necessary, he should request clarification from Dr. Jensen as to her meaning in assigning "mild

to marked" limitations to plaintiff in various areas of mental functioning;

(3) The ALJ must make specific findings regarding the nature of plaintiff's stress, the circumstances that trigger it, and how those factors affect her ability to work, and integrate those findings into the RFC determination;

(4) The ALJ is directed to consider each of plaintiff's mental health impairments and determine, at step two, whether each impairment is severe. The ALJ must then proceed through the balance of the sequential evaluation process with due consideration to all of plaintiff's limitations, whether stemming from severe impairments or not;

(5) The ALJ is directed to consider Listings 12.03 and 12.04, as well as any other listing deemed relevant to plaintiff's impairments;

(6) The ALJ is directed to obtain a competent medical opinion, preferably from a treating source, as to whether plaintiff met the requirements of either Listing 12.03 or 12.04;

(7) The ALJ is directed to reconsider his findings with regard to credibility; and

(8) If the issue of disability is not resolved at step three of the analysis, the ALJ is directed to reconsider his step four finding regarding plaintiff's ability to perform past relevant work.

**VII. Conclusion**

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings (Doc. 14) is denied and plaintiff's motion (Doc. 11) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated:      December 9, 2016
            Rochester, New York.

20